Jose TORRES, Plaintiff,

v.

Sergeant CARRY et al., Defendants.

No. 08 Civ. 8967(VM).

United States District Court,
S.D. New York.

Aug. 4, 2011.

Jose Torres, Fallsburg, NY, pro se.

Inna Reznik, Attorney General of the State of New York, New York, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Pro se plaintiff Jose Torres ("Torres") brought this action (the "Complaint") pursuant to 42 U.S.C. § 1983 ("§ 1983") against the New York State Department of Correctional Services ("DOCS"); Green Haven Correctional Facility ("Green Haven"); Sergeant Daniel P. Carey ("Carey"), named as "Sergeant Carry"; Sergeant Clerc ("Clerc"), named as "Sergeant Clare"[1]; and Correctional Officer Egan[2] ("Egan" and, together with Carey and Clerc, "Officer Defendants"), named as "Correction Officer Edgard."[3] The Complaint alleges violations of Torres's constitutional and statutory rights arising from the use of excessive force by the Officer Defendants. Carey now moves for sum-

---

1. The Complaint names "Sergeant Clare" in its caption, but also discusses the alleged actions of a "Sergeant Clark." During his deposition, Torres referenced a "Sergeant St. Claire" and testified that he incorrectly wrote "St. Claire" as "Clare" in his Complaint. In his Rule 56.1 Response ("Response") to the instant motion, Torres states, for the first time, that he misspelled Clerc as "Clare" in his Complaint. Clerc was a sergeant at Green Haven at the time of the alleged incident. For the sake of clarity, and unless otherwise specified, the Court refers to this officer as Clerc throughout its discussion.

2. During his deposition Torres testified that he misspelled Egan as "Edgard" in his Complaint.

3. Pursuant to this Court's Decision and Order dated February 3, 2010, DOCS and Green Haven were dismissed from this action.

mary judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). For the reasons discussed below, Carey's Motion is GRANTED.

Further, in his Response, Torres asserts, for the first time in this litigation, a claim of conspiracy against the Officer Defendants and requests additional time to effect service of the Complaint upon Egan and Clerc. For the reasons discussed below, Torres's conspiracy claim fails and his application for an extension of time is DENIED.

## I. BACKGROUND [4]

### A. INTRODUCTION

This action arises out of events that occurred at Green Haven on September 14, 2005. Torres was incarcerated at Green Haven at the time of the incident. On that evening, Torres was moving through a prison corridor by the F and G Housing Units (the "F and G Corridor") to the prison yard for his recreation period. The next day, Torres was taken to an outside hospital where it was determined that he had suffered a fracture to his right hand and a sprained back and neck. Aside from these facts, practically all other details regarding the incident are in dispute. Torres's version of the incident that he alleges occurred on September 14, 2005 is described in an Inmate Grievance Complaint ("Grievance") he filed at Green Haven the following day, as well as his Complaint, deposition testimony, and Response in this action. Carey's version of events is presented in a statement submitted on September 19, 2005 to a Green Haven investigation officer and a declaration submitted in connection with his Motion.

### B. THE GRIEVANCE

Torres's Grievance, filed on September 15, 2005, alleged that, on September 14, 2005, as Torres was travelling through the F and G Corridor, an unidentified correctional officer stopped him to conduct a pat frisk. During the frisk, a second officer approached the officer performing the pat frisk, and a conversation ensued. According to the Grievance, the second officer suddenly grabbed Torres's left wrist and an unspecified number of other officers, including two sergeants, attacked him. Torres alleged in his Grievance that one of the two sergeants involved in the attack in the F and G Corridor was "Sgt. Carry." [5] Other than "Carry," Torres's Grievance did not provide the names of any other officers or sergeants involved in the alleged attack. The Grievance stated that after the attack, Torres was escorted back to his cell by "Carry" and another officer, at which time "Carry" allegedly informed Torres that "if [Torres does] not say anything, [he] will not receive a ticket or be locked up." (Reznik Decl., Ex. B ¶ 8.) Torres's Grievance discussed events that took place only at the F and G Corridor.

---

4. The summary below derives from materials submitted to this Court by Carey and Torres in conjunction with the Motion and exhibits attached thereto. These include: (1) Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated January 31, 2011; (2) Declaration of Inna Reznik, dated January 31, 2011 ("Reznik Decl."); (3) Declaration of Lieutenant Daniel Carey ("Carey Decl."); (4) Plaintiff's Statement of Disputed Material Facts Pursuant to Local Rule 56.1, dated March 15, 2011 ("Pl. 56.1 Resp."); and (5) Reply Memorandum of Law in Support of Defendant Carey's Motion for Summary Judgment. Except where specifically referenced, no further citation to these sources will be made.

5. Because the reliability of Torres's identification of the Officer Defendants is a key point of contention in this case, the names given in quotation marks used below are represented exactly as Torres provided them in the documents and testimony cited.

Further, although Torres claimed that many of the inmates from his cell block observed the entire incident, and Torres also informed his family and a Correctional Officer Parcell ("Parcell") about the attack, Torres did not submit any statements from Parcell or other inmates along with his Grievance.

## C.  DOCS INVESTIGATION

Upon receiving Torres's Grievance, the DOCS Inmate Grievance Program conducted an investigation ("DOCS Investigation"). Lieutenant T. Gotsch ("Gotsch") prepared an investigative memorandum ("Investigative Memo") dated September, 28, 2005 detailing the findings of the DOCS Investigation. As part of the investigation, Gotsch interviewed Torres, as well as other inmates and officers present at the time of the alleged incident. During his interview with Gotsch, Torres made additional allegations not included in his Grievance. In particular, Torres reported to Gotsch that, while he was being pat frisked at the F and G Corridor by an unidentified first officer, a second officer grabbed Torres's left arm and pinned it behind his back. The Investigative Memo stated that Gotsch believed this second officer to have been Egan. At this point, Torres alleged that a sergeant grabbed his fingers and bent them backwards. Although Torres told Gotsch that he believed that it was Carey who bent his fingers, Gotsch concluded in the Investigative Memo that Torres was mistaken and rather the sergeant in question was actually Clerc. Indeed, Clerc confirmed in his interview with Gotsch that he was present in the F and G Corridor at the time of the alleged incident, although he denied using any force against Torres. Torres also claimed that, after the initial altercation in the F and G Corridor, he was taken to the F and G Corridor Sick Call Room (the "Sick Room"), and was assaulted by approximately ten officers.

The Investigative Memo noted discrepancies between Torres's interview and his Grievance. In particular, Torres did not allege in his Grievance that an assault occurred in the Sick Room or that his fingers were bent back. Rather, those allegations were mentioned for the first time in Torres's interview with Gotsch. The Investigative Memo presented varying accounts from other inmates, but no inmates could, or were willing to, identify any officers present at the F and G Corridor at the time of the alleged incident. All officers interviewed by Gotsch denied that an assault occurred. Both Egan and Sergeant Beard ("Beard") admitted to being present for the pat frisk, but denied using any force against Torres. Egan claimed Torres had forgotten his identification card and in turn was placed in the F and G Corridor Sick Call Room (the "Sick Room") at the direction of Beard. Beard reported that, after he spoke with Torres in the Sick Room, he and Egan escorted him back to his cell block and issued a Misbehavior Report. Clerc's statement corroborated this course of events. Additionally, the Investigative Memo stated that Officers Brown, Doherty, Harding, Hearne, Granger, Thisse, Gleason, LaMountain, and Barnaby were all present at the F and G Corridor during the pat frisk and each reported to Gotsch that they did not witness any force used against Torres.

In his statement to Gotsch, Carey reported that on the day of the alleged incident he was patrolling the perimeter of the facility on his 2:00 p.m. to 10:00 p.m. shift and did not enter the facility at any time during his shift. He also claimed that he was unaware of any incident on that date involving Torres. Carey's testimony that he was not present inside Green Haven at the time of the alleged incident was cor-

roborated by Officers Clerc, Beard, Egan, LaMountain, Doherty, and Gleason.

The Investigative Memo concluded that "[t]he only evidence not in dispute in this case is that inmate Torres received a hand injury" and that he found "no conclusive evidence that [Torres] was assaulted by staff." (Reznik Decl., Ex. C ¶ 21.)

## D. THE § 1983 ACTION

### 1. The Complaint

In the Complaint, Torres alleges he was pat frisked by "Edgard" on September 14, 2005 during the evening recreation movement from his cell block to the yard. Torres alleges that after complying with "Edgard's" instructions to place his hands on the wall for the pat frisk, "Edgard" slammed Torres's face against the wall and threw him to the ground. The Complaint also alleges that, while other unidentified officers held Torres to the ground, "Edgard" kicked and stomped on Torres's hand, neck, and lower back. Torres asserts that "Clark" instructed "Edgard" to kick Torres, and that "Carry" also kicked, punched, and verbally assaulted Torres. The Complaint does not state the location in the facility that the abuse by "Carry" allegedly occurred. However, as in the Grievance, Torres did not make any reference in his Complaint to any events occurring in the Sick Room.

The Complaint names "Carry," "Edgard," and "Clare" as individual Officer Defendants. Although the Court's docket indicates that the United States Marshals Service (the "Marshals") attempted to serve the Officer Defendants on May 12, 2009, the Marshals notified Torres by mail on June 3, 2009 that their efforts to effect service on "Edgard" and "Clark" had been unsuccessful.

### 2. Torres's Deposition

On November 15, 2010, Torres was deposed by Carey's attorney in connection with this action. During the deposition, Torres's story changed in material ways from the versions of events portrayed in the Grievance and the Complaint. For example, whereas in the Complaint, Torres alleged that Egan was the officer who pat frisked him, Torres testified at his deposition that Egan approached the scene while another officer pat frisked Torres and asked if Torres was "trying to be slick." (Pl. 56.1 Resp., Ex. C at 22:3.) Similarly, although not mentioned in the Grievance or Complaint, Torres testified at his deposition that a "St. Claire" pushed Torres's hand against the wall, punched it, and pulled back his middle finger. Torres also testified that the officers then dragged Torres, while cursing at him, to the Sick Room. According to Torres, as Egan kicked and punched Torres's back and neck in the Sick Room, Carey entered the Sick Room, and hit Torres on the head and "knocked him out." (Pl. 56.1 Resp., Ex. C at 23:9.) Torres stated that after the attack in the Sick Room, Carey, Egan, and another unidentified officer escorted him back to his cell.

When asked at deposition how he was able to identify Carey, Torres stated that he recalled seeing the officer's nametag on his shirt pocket. However, when asked to describe Carey physically, Torres was unable to do so beyond stating that Carey was not black, was taller than Torres, and did not wear glasses. Torres stated that he could describe Egan well, however, because Egan was the officer who hit Torres's head against the wall.

Again, Torres testified that although there were a number of inmates and officers present at the F and G Corridor on the night of the alleged incident, Torres

did not intend to call any witnesses at trial to corroborate his version of events.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

In connection with a Rule 56 motion, "[s]ummary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the burden of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994).

However, the party opposing summary judgment must come forward with materials setting forth specific facts showing that there is a genuine issue of material fact; he cannot defeat summary judgment by relying on the allegations in the complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible. *See Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Furthermore, a non-movant must produce more than "a scintilla of evidence" in support of his position. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Essentially, "[a]t the summary judgment stage, a non-moving party must offer some hard evidence that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998).

■ The Court is mindful that where, as here, a party appears pro se, courts must construe pro se pleadings broadly and interpret them "to raise the strongest arguments that they suggest." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (*quoting Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Pro se status does not, however, "relieve [a non-movant] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (internal citation and quotation marks omitted).

### B. *ANALYSIS*

■ Carey's primary argument in support of his Motion is that he was not involved in the alleged incident on September 14, 2005. Rather, Carey maintains that, at the time of the incident, he was working a shift outside of the prison facility as the Outside Perimeter Sergeant. Carey avers that he does not recall entering the facility during his shift on that date. In support of his argument, Carey relies on the various statements submitted as part of the DOCS Investigation in 2005 and a declaration submitted in support of his Motion. Carey also refers to the conclusions contained in the Investigative Memo, which found that Carey was misidentified as the sergeant who injured Torres's hand.

In opposing the Motion, Torres relies on his own prior testimony, contained in the Grievance, the Investigative Memo, the Complaint, and his deposition, which he supplements with general averments about the behavior and practices of Green Haven correctional officers. Torres contends that after Egan and Clerc assaulted him in the

F and G Corridor, Carey joined in the assault in the Sick Room. Torres's sole basis for identifying Carey is the nametag worn on Carey's shirt pocket. Torres also asserts, based on his personal knowledge gained in the course of twenty years of confinement in DOCS institutions, that sergeants are vested with the authority to move about the facility without restriction.

Upon review of the entire record, the Court finds no genuine issue of material fact as to whether Carey was personally involved in the alleged incident. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir.2001) ("Proof of an individual defendant's personal involvement in the alleged wrong, is of course, a prerequisite to his liability on a claim for damages under § 1983."). Although questions of evidentiary weight and credibility are normally not to be decided at the summary judgment stage, where a "plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," and where, even after drawing all inferences in the light most favorable to the plaintiff, no reasonable person could believe the testimony, the court may grant summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005); *see also Shabazz*, 994 F.Supp. at 470 (granting summary judgment where record contained no evidence corroborating the plaintiff's version of the events, which suffered from numerous inconsistencies and contradictions).

Here Torres's allegations of Carey's personal involvement in the alleged incident are supported solely by his own contradictory and incomplete testimony given on multiple occasions over a span of over five years. The versions of events presented by Torres in the Grievance, Complaint, interview with Gotsch as part of the DOCS investigation, and at his deposition differ in significant ways. For example, Torres's Grievance, filed the day after the alleged incident, claimed that "Carry" attacked Torres in the F and G Corridor. During his deposition, however, Torres directly contradicted his Grievance by insisting that Carey was never present at the F and G Corridor, and appeared only after Torres had been moved to the Sick Room. However, in both the Grievance and the Complaint, Torres failed even to mention that he was taken to a Sick Room, whereas at his deposition he testified that the assault occurred primarily in that second location.

The Investigative Memo also highlights the utter paucity of evidence which could establish that Carey was present during the alleged incident. In his interview with Gotsch, Torres named Carey as the officer who bent his fingers backward in the F and G Corridor, but in his deposition, Torres testified that "St. Claire" was the officer who did so. Based on the full DOCS Investigation, conducted just two weeks after the alleged incident, the Investigative Memo concluded that Torres had mistaken another officer for Carey. Similarly, at his deposition, although Torres admitted that he was unable to describe Carey's appearance, or even identify his race, height or whether he had facial hair, Torres testified he was able to describe Egan well, because Egan was more involved in the attack—having kicked and punched him both at the F and G Corridor and in the Sick Room.

Under these circumstances, Torres's sole remaining basis of support for his contention that Carey was personally involved is his recollection of Carey's nametag. However, Torres failed to mention the nametag in his Grievance, during the interview with Gotsch, or in his Complaint. It was only during his deposition, almost five years after the alleged incident, that Torres asserted for the first time that he recalled seeing Carey's nametag.

Furthermore, although Torres claims that numerous inmates and officers observed the incident, he has never introduced statements from any witness to corroborate his version of events or to positively identify Carey at the scene. He also stated in his deposition that he does not plan to call any witnesses if a trial were to go forward. Torres's failure to present an even minimally consistent account as to what happened, where it happened, or by whom he was assaulted, renders his testimony inherently incredible and unreliable. *See Jeffreys,* 426 F.3d at 555. Even drawing all inferences in the light most favorable to Torres, no reasonable juror could accept Torres's claim of Carey's personal involvement. *See Gaston,* 249 F.3d at 164.

By contrast, for five years Carey has consistently and repeatedly denied being present at the F and G Corridor and the Sick Room at the time of the alleged incident. This version of events has been corroborated by the testimony of at least seven other officers. Indeed, while Egan, Clerc, and Beard admit to interacting with Torres during the pat frisk at the F and G Corridor and in the Sick Room, no officer or inmate has indicated that Carey was present, or even inside the facility, at the time of the alleged incident.

Torres insists that DOCS sergeants may move freely about the facility and that Carey, as a sergeant, would not have been assigned to outside work details. However, Torres does not support these claims with any actual evidence. Such general statements cannot satisfy the requirement that plaintiffs must set forth specific facts demonstrating that there is a genuine issue of material fact to counter a motion for summary judgment. *See Gottlieb,* 84 F.3d at 518. Accordingly, Carey's Motion must be granted.

## C. *CONSPIRACY ALLEGATIONS*

For the first time in his Response, Torres asserts that the "conspiritory [sic] nature of the facility level investigation clothed under a code of silence." The Court liberally construes this statement to be a conspiracy claim pursuant to § 1983. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). To support such a claim, a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party, (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002); *see also Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). Thus, a plaintiff must show that "defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*quoting Hameed v. Pundt,* 964 F.Supp. 836, 839 (S.D.N.Y.1997)) (internal quotation marks omitted); *see Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000).

As a threshold matter, Torres's conspiracy claim fails because he raises it for the first time in opposition to a motion for summary judgment. *See Hawana v. New York,* 230 F.Supp.2d 518, 534 (S.D.N.Y.2002) ("The plaintiff cannot raise new claims in a response to a motion for summary judgment."). Even if it were properly presented, Torres's conspiracy claim is without merit. Torres argues that a discrepancy between the affidavits of several DOCS officers provides evidence of a conspiracy. Specifically, Torres notes that, in their statements submitted as part of the DOCS Investigation, Officers LaM-

ountain, Gleason, and Doherty stated that they did not see any inmates taken into the Sick Room at the time of the alleged incident, whereas Egan, Beard, and Clerc claimed they led Torres to the Sick Room. Whatever the reason for this discrepancy, standing alone, it does not even begin to support an inference that an agreement existed between officers to act in concert to inflict injury as required under § 1983. *See Ciambriello*, 292 F.3d at 325. Therefore, there is no genuine issue of material fact as to Torres's conspiracy claim.

### III. *EXTENSION OF TIME*

■■■■ Also, for the first time in his opposition to the Motion, Torres requests an extension of time to effect service upon Clerc and Egan. Rule 4(m) of the Federal Rules of Civil Procedure ("Rule 4(m)") requires that service of a summons and complaint must be made within 120 days of issuance of the summons. *See* Fed. R. Civ. P. 4(m). Where a plaintiff can demonstrate good cause for his failure to effect service within 120 days, a court shall extend the time for service. *Id.* "In determining whether a plaintiff has shown good cause, courts weigh the plaintiff's reasonable efforts and diligence against the prejudice to the defendant resulting from the delay." *DeLuca v. AccessIT Grp., Inc.*, 695 F.Supp.2d 54, 66 (S.D.N.Y.2010). Even if good cause does not exist, the court may grant a discretionary extension. *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir.2007).

■■■■ While the Court is mindful that it has an "obligation ... to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training," *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir.1983), in this instance, the Court finds no basis for an extension of time. Indeed, Torres has failed to demonstrate

even the most minimal level of diligence in ensuring that service was completed upon Clerc and Egan. Torres filed his Complaint on October 20, 2008, yet almost three years later, Clerc and Egan have yet to be served. While Torres claims that he was unaware that Egan and Clerc had not been properly served, he was sent notice of the Marshals' inability to effect service on June 3, 2009. Throughout the course of this action, from the filing of the Complaint, through the entire course of discovery, in which he participated fully, Torres has provided no further information to identify Clerc or Egan, nor has he sought assistance from the Court. Torres has had ample opportunity to correct his failure to serve Egan and Clerc, but has not done so. Consequently, Torres has not demonstrated the diligence and effort necessary to constitute "good cause" for an extension of time.

Because discovery is now complete in this case and more than five years have passed since the date of the incident, the Court finds that Clerc and Egan would be unfairly prejudiced were an extension of time to be granted. *See Echevarria v. Dep't of Corr. Servs.*, 48 F.Supp.2d 388, 392 (S.D.N.Y.1999) (denying pro se plaintiff extension of time for pro se plaintiff to serve complaint where the incident occurred more than four years prior and the plaintiff made no effort during that time to serve the defendants or correct the misspelling of their names). Accordingly, Torres's request for an extension of time to serve Clerc and Egan is denied.

### IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 55) of defendant Daniel P. Carey for summary judgment is GRANTED; and it is further

**ORDERED** that application of plaintiff Jose Torres deemed contained in his Statement of Disputed Material Facts Pursuant to Local Rule 56.1 (Docket No. 63) for an extension of time to serve defendants named as "Sergeant Clark" and "Correction Officer Edgard" is DENIED.

The Clerk of Court is directed to terminate any pending motions and to close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**